May it please the Court, my name is Jia Kim, appearing on behalf of Appellant Lezmond Mitchell. The District Court erred by denying, without an evidentiary hearing, Mr. Mitchell's Section 2255 motion to vacate his convictions and death sentence under the Federal Death Penalty Act. This morning I plan to focus on the certified issues of ineffective assistance of counsel, and I'd like to reserve eight minutes for rebuttal. On this record, the District Court could not properly deny relief without an evidentiary hearing for two reasons. First of all, the statutory framework set forth by Section 2255 contemplates a low threshold for an evidentiary hearing. The files record in motion must conclusively show that the petitioner of the movement is entitled to no relief. This Court has lost that standard as indicating that a hearing is required unless the allegations fail to state a claim for relief are palpably incredible or patently frivolous. Let me ask you this on the certified issues. What would you need a hearing on? We would need a hearing on, first of all, the District Court. The second reason that an evidentiary hearing is warranted is because the District Court resolved certain factual disputes in the record. Silently. And in the hearing, the... Give me an example of what you need a hearing for. Certainly. For instance, the District Court found, as sort of a foundational premise of the decision, that the trial counsel made a strategic decision not to present a voluntary intoxication defense at either phase of the trial. The decision completely overlooked the fact that such instructions were requested at each stage. Okay. Well, you have that in the record. What do you need a hearing for? Excuse me, Your Honor? The fact that they requested an instruction is in the record already, so why do you need a hearing? Yes, Your Honor. However, the District Court found that credited trial counsel statements that they did not pursue. Okay. Maybe she made an error of law, but what fact do you need to elicit that isn't already in the record? There were other factual disputes that she resolved. For instance, whether the first mental health expert, Dr. Parrish, that they consulted, a psychologist, had diagnosed Mr. Mitchell as sociopathic, whether trial counsel followed up... Wait. Was that disputed somewhere? Yes, Your Honor. They say he was diagnosed sociopathic, and somebody else says he didn't diagnose him sociopathic? One attorney said that she did not provide a diagnosis. The attorney who did the bulk of the mitigation, but was retained to sort of consult and coordinate the mental health presentation. Another attorney who was less involved in mitigation said, I believe that she didn't diagnose him as sociopathic. The decision takes the second attorney's statement based on his vague belief that that was the diagnosis and does not mention... Was the diagnosis itself in the record? No, Your Honor. There was no... This was based on counsel's deposition testimony, that that first... This is Dr. Parrish, the psychologist. There was a second expert, Dr. Lorenz, who did provide diagnosis, a psychiatrist. Was there any dispute that he's sociopathic? There isn't on this record. You didn't come forward with anything from another doctor in the 2255 proceedings to say, this guy's got other problems, not sociopathy? Dr. Stewart, the psychiatrist who submitted a declaration in the 2255, diagnosed Mr. Mitchell with post-traumatic stress disorder and substance-induced psychotic disorder. And Dr. Morenz, when given the information about Mr. Mitchell's substance abuse in the period immediately preceding the offenses, said that that could have made a difference to his diagnosis. And that's also one of the errors of law that the district court made here, was that the district court said that counsel has no affirmative duty to present experts with this sort of background information. And while that may be true at the guilt phase, this court has drawn a sharp distinction between the guilt phase and the penalty phase, and there is such an affirmative duty at the penalty phase. And the result of this deficient investigation of intoxication, in particular counsel's failure to interview the residents of the Nakai House regarding substance abuse and intoxication, led directly to that gap, not only in the social history report, but also in the psychiatric report, which they had. So we have a lot of expert reports in the record that were contemporaneous with the trial proceedings. Were any of those introduced in the trial at all? Were they used at all in the trial? No, Your Honor. There was a social history report prepared by the mitigation specialist, and there was a psychiatric report that also included some neuropsychological evaluations that another expert had performed. Those were not presented at trial. At one point, Mr. Bartolomé, who handled most of the mitigation a few weeks before trial started, said... the guilt phase and the sentencing phase? No, Your Honor. They were not submitted at either phase. At one point, one of the attorneys said, yes, there probably will be a social history expert to present in the penalty phase. However, no social history expert was presented. Again, this conflicted with trial counsel's depositions, in which they stated, well, early on, we had decided not to present that kind of information. But they still had all these reports done, so did you get them in discovery during the habeas proceedings? Is that how they're in our record? Yes, they're in our record through the files of trial counsel. So what is your contention with respect to each of those experts? Is your argument that it should have triggered a further duty of investigation on the part of the trial counsel, or that these reports should have been introduced instead of going with the life-worth-saving defense at the penalty phase? It varies with respect to each expert. A gap in both reports was this failure to interview the people he was living with at the time regarding substance abuse. There was conflicting information in the record as to whether he was intoxicated at the time. The FBI statements, while they varied tremendously in other details, were fairly consistent in mentioning alcohol intoxication. Trial counsel's depositions, they said that he denied it to them. They essentially delegated this investigation of intoxication to their mitigation specialist, who spoke about some substance abuse with Mr. Mitchell. However, there are indications that he had stopped using certain drugs a month or two before. Mr. Mitchell provided different information to the psychiatrist, who apparently didn't know, for instance, that he had used methamphetamine. He didn't have this background information that we now know regarding the kinds of substances he was using in the months, weeks, days before, the degree to which he was using them. And that is something that he said could have made a difference to his diagnosis. You said something about the decision being made before the trial as to what mitigation strategy they would pursue? Yes, trial counsel, two of the three trial counsel basically said that we don't want to present negative information from his background regarding the abuse of childhood, whippings, beatings, verbal abuse. One of the attorneys who did the penalty opening and closing said, yes, we sought to bring out that information. I thought that was well presented. If you look at the record of the penalty phase, there was mention of he had a terrible childhood, he had an awful childhood. That was limited to information that he had a cold home. As the government put it, his mother wasn't in the picture at times. His grandmother perhaps was overly focused on her career. So there is also a failure to present information of which they were aware once they had decided to go down this road. So they made a judgment call that they thought a different avenue would be more productive. I would disagree, Your Honor. Well, you just said. I mean, they had this information and decided to do something else. Two of the attorneys said that they had decided not to present it at all. So again, there is a conflict between what they said. When was this decision made? Because one of the questions we'll be looking at is the investigation. When did they decide? At what point was it decided that they wanted to show that this was a fine fellow? It's unclear, Your Honor. That's one of the disputes in the record. It's from based on counsel's representation that there might be a social history expert. Presumably to bring out the report of the difficult childhood, the troubled upbringing in the social history report, it couldn't have been made more than a few weeks before trial. There's no discussion of why, whether such an expert was consulted. There's no evidence in the record of that. What we do know is that they obtained all this information through the Ockenfells, is that her name? And Bartolome, who was running the mitigation show, apparently decided to pursue a different course, and he gave his reasons why. Do I understand the story right? He gave his reasons why. It's not like they said, gee, I didn't realize it was in the file, or I was goofing off, or I didn't have time. They had this information, and then he made a lawyerly judgment that a different mitigation defense would be more profitable. However, the record shows that they did, in fact, try to bring this information in. That's what Bartolome thought. However, Attorney Sears said, yes, that was part of our plan. So again, there's a deep conflict between what the different attorneys are saying regarding their strategy. There's no dispute about the fact that they knew this information, is that true? They knew much of the social history information. Bartolome went with Ockenfells to the reservation and interviewed these people with her, didn't he? I'm not clear on whether he went with her. He interviewed some of the closer family members. They didn't know about the substance abuse prior to the offenses. They thought, yes, he was critical. No, they did know. They said they looked for evidence to support an intoxication defense, and they couldn't find it. Isn't that what they said? They looked at the FBI crime scene photographs. And they talked to him about it. They talked to Mitchell about it. Yes, however, under prevailing professional norms, if there are these inconsistencies, you can't just rest with Mr. Mitchell's statements. Right. So they looked at the photos. The other person who was there was a co-defendant. They couldn't very well get it from him. And your client denied it to them. Yes, Your Honor. However, they failed to interview, and here looking at the penalty phase, beyond just intoxication at the moment, but the broader universe of substance abuse, they failed to interview his associates, the people he was living with at the time. Or even his mother. They didn't interview his mother, did they? They attempted to. They were not very successful in doing so. Well, they did, in fact, go and contact her, didn't they? They did contact her. And they wound up getting on her wrong side, isn't that right? The mitigation specialist and the attorneys, yes, did alienate Mr. Mitchell's mother. Did they interview the grandfather, who was the person who primarily brought him up? I believe that they did talk to the grandfather. There was no information in the record as to what was elicited from him. The defense lawyers say, you know, when you consider the facts of the case, you know them as well as we do, how horrendous they are. They made a judgment call that the fact that this guy may have been partying hard before they did this was going to be a hard thing to sell, especially since it was part and parcel of a planned armed robbery. Why would that be an unreasonable thing for lawyers to conclude? It would not necessarily be unreasonable if it had been backed by sufficient investigation. However, again, because they did not know. They said, we thought he was drinking some, partying was sort of his term, taking some marijuana. They, one of the attorneys said, well, I didn't think, you know, meth was really on the reservation at that point. He may be extabled in these harder drugs, but he wasn't really addicted to them. So you, I want to understand this. So you want an evidentiary hearing on whether, in fact, this was a strategic decision in the penalty face, based upon a reasonable investigation as required by the ADA rules? Yes, Your Honor. Also, I think the fact that they, in fact, sought this impaired capacity instruction at the penalty face, belies their statements in the depositions that we didn't want to bring any of this in. And looking at the record, it appears to be a sort of last second decision. Bartolome, who was primarily handling this case, when asked at the deposition, what do you remember about seeking that voluntary intoxication instruction? He said, I don't really remember discussing that before it was done. I was focused on other things. I get back to the question I asked you at the beginning. These facts that you were telling us about are all in the record already, including Bartolome's statement that you're quoting now. Now, I think your argument, correct me if I'm wrong, but I think what you're saying is that Judge McGee had this information and just came to the wrong conclusion about it. Well, on this record, if there were disputes between those, she couldn't resolve them without a hearing. Part of the reason why, in cases like Massaro, the Supreme Court has encouraged ineffective assistance claims to be brought in 2255 is precisely to test the demeanor and credibility. I think if she were to make a factual finding on this record, it would have to go on the basis of the undisputed record, which is that they did, in fact, seek to present these defenses, and cases from Wiggins to Richter say that courts shouldn't indulge counsel's post hoc rationalizations of what they did when it's belied by the undisputed evidence in the record. So if I got you right, if we were to send this back for an evidentiary hearing, the purpose of the hearing would be to ask counsel why did you do what you did? It would be partially that and also just simply to make this finding with the process that the Supreme Court has indicated. That's kind of vague. Can you tell me specifically what you'd want to develop at the hearing? One was, why did counsel make the decisions they made? And when did they make them? And if they made them, who made them? And if they intentionally deviated from them, was that a strategic decision? Yes, Your Honor. I'm trying to get you to tell them. Yes. Yes, Your Honor. Given all of this information in the record about we plan to call a social history expert, at one point they said, oh, we might call the Nakai brothers as witnesses without ever having interviewed them. If these were strategic decisions, if they did go back and confront Mr. Mitchell with this evidence of intoxication, when was it done? Who was handling which part of the penalty phase presentation? The record, as it appears now, gives the impression of a too-many-cooks sort of situation, and that this Court has held that, you know, if failures in the penalty phase investigation or presentation emerge from a collective failure in that part based on this role confusion, that that can also be deficient performance. So that is what we would wish to establish at a hearing. And basically, 2255 requires such a hearing as long as the claims aren't conclusively frivolous or incredible. The Eighth Circuit has said unless the record affirmatively refutes that there was no deficient performance and no prejudice. You deposed all three lawyers, defense lawyers? It was the government's depositions, but, yes, there was cross-examination. You have ten and a half minutes. You wanted eight. Do you want to save it for rebuttal? Yes, Your Honor. Thank you. Thank you. May it please the Court. I'm Vincent Kirby. I'm from the District of Arizona. The question for the Court, and the Court has developed some of this, is the investigation that was performed. The factual findings by the District Court judge are not clearly erroneous. The defense argues some of that. The factual findings? The factual findings. Okay. The fact that there was a mitigation report, that there were psychological reports, that friends, family, school officials were interviewed. The defendant was interviewed in great detail. There is really nothing that they are missing. There is this overriding concern that they did not interview the Nakai brothers about what exactly was going on in today's law. Well, there's more than that. The question is, did they conduct the kind of investigation that's required under the ABA guidelines, for instance, in 2003, which requires the investigation of the whole family and social history, including physical, sexual, emotional abuse, family history of mental illness, cognitive impairment, substance abuse, domestic violence, all of those family connections, particularly the grandfather with whom he lived, whether that was all performed as the investigation under the 2003 guidelines. Your Honor, you are quoting from the 2003 guidelines. Yes. We submitted that because those guidelines came out about a month before the trial started, that this investigation should really be looked at. Wasn't it about three months? We kind of, we did the timeline of it in our chambers, actually. You had maybe three to five months when they became effective, but they had actually been written. So you were, you operated clearly under both the 1989 and the 2003 guidelines. Yes. And you were one of the trial counsel, right? I was the prosecutor. You were the prosecutor. Okay, so were you aware of the guidelines, the 2003 guidelines back then? I, no, I was not. Okay. There really were guidelines for the defense, right? There are not very many guidelines for the prosecution. There should be. That's unfortunate. Well, Judge, perhaps another day we can discuss the guidelines. Actually, you have guidelines. But we do have guidelines. I mean, you know, they may not be written by the ABA, but we certainly have guidelines. And the question really is how much of the background, what were they on notice of? They talked to the family. They had some information from the mother, Sherry Mitchell, before she decided to stop cooperating. They talked to Bobby Mitchell. They talked to George Mitchell. None of these new allegations about maybe George Mitchell may have molested someone back in the early 80s was ever known to anybody that they contacted. It was not brought to their attention. And the question really is if Mitchell himself is not telling his counsel, hey, I was molested, he's not telling Vera Ockenfels, he's not telling Dr. Morenz that I was molested. But you can't, in the penalty phase, the counsel can't stop there, right? Just his word. I mean, there was a whole host of people that they could have interviewed and found conflicting information to that which was portrayed in the penalty phase. Your Honor, they did not just take his word for it. They did take a look. They went to the crime scene and they looked there for evidence, right? They went to, Your Honor, there are several crime scenes. Well, I'm talking about the scene of the murder, which is the one for which he has the death penalty. They were at that scene twice. Okay, but did they interview any of the other people with whom he'd been residing during the past year? They attempted to interview Johnny Orsner. They actually brought him to trial and he took the Fifth Amendment, so obviously he could not be interviewed. The record, they are not clear that they talked to the other defendants, almost all of the others with the exclusion of one person named Padrian. We're under indictment. There was a kind of a related carjacking case involving Johnny Orsner and the Nakais about two months earlier. And these cases were tracking in parallel. In fact, by the time of this trial, Gregory Nakai and Johnny Orsner had been convicted in the first case. Jimmy Nakai had testified against his brother and had pled guilty. Jay Green Nakai had pled guilty. So all of these people were represented by counsel and at various stages of the criminal proceeding. It's a little difficult to judge based on what I've seen so far. I mean, possibly with a complete reading of the transcript and the record, it would become clearer. But as I read the guidelines, and I think they were known or should have been known to a defense counsel trying a capital defense case, it requires a really more extensive inquiry into the whole family circumstances, not only what happened to him, what he was exposed to, what he saw. They even talk in the guidelines about, you know, natural disasters. I don't know why, and I don't think it has anything to do with this case. But, I mean, it's a very extensive investigation that's required before you execute someone. The question partly based on my lack of knowledge as to the timing, as to when they decided that the, you know, good guy defense is a viable defense in mitigation in a case like this. I mean, we have cases like Correll which say that this is not the kind of a case with this kind of brutality in which you would try a good guy defense unless, you know, everything else is, you know, out of the question once you've made an extensive investigation. Well, how much of the investigation did they do, or how much did they not do, because they thought good guy defense is the right defense in this case? At some point they made that decision, I guess. We're going to say that this guy was such a wonderful student that the fact that he did what he did should be ignored. That's a pretty tough, you can make that decision, but that's a pretty tough defense to justify, given the facts of the case, and that's what Correll certainly says. Judge, I know that we've gotten into this, it was a life worth saving good guy defense, but I think it's a little larger than that. They were trying to show that this was at best an aberrant act, and you ask when they may have made this decision. I point out to the court that Ms. Ockenfield's report was prepared, it was written up about November of 2002, the trial began in April of 2003. They sent him to see Dr. Morenz for the latter part of 2002 and early 2003, and got nothing that they could possibly use at trial. I mean, an antisocial personality disorder diagnosis, shooting a girl during a drug deal, fighting with people, just not the kind of evidence that they talk about. They were looking for some nugget to explain why Mitchell did what he did, and unfortunately I think it was the antisocial personality disorder is what caused him to do what he did. So they tried to blame Orsinger, they tried to show that there was a disparity between Orsinger not eligible for the death, Gregory McKay not eligible for the death. Yeah, that's different from, you know, what you sometimes do after trial. You see some things that don't work during trial. The after trial, you look differently for what you want. You're not trying to have him declared innocent. You're trying to say what is it about this person that might make a jury, one jury at least, sympathetic. And nothing about the facts of this crime are going to make any juror sympathetic or anything but hostile. And nor is it this is such a good guy that we ought to keep him alive. He doesn't seem to be such a good guy. It seems to be just the opposite. And what you would try to do, I'm sure if you were the defense counsel, would be you'd try to say now what kind of an upbringing did he have? What was his life like at his grandfather's house? And from reading some of the affidavits that they now submitted, it seems you could have found, not you, I mean the defense counsel could have found, or the investigators could have found a lot about his life that might make one juror say, my God, it's surprising he didn't kill 20 people after that kind of an upbringing and that kind of a family. The whole thing seems kind of, the whole system seems kind of ironic that you have to prove how terrible and how antisocial he is to mitigate a sentence. But that's what it is. But Jed Silverman says correctly that there are tactical decisions that a lawyer has to make. A lawyer has to say, do I have a better chance of convincing somebody that this is a life worth saving? Or that this guy has had such a horrible upbringing that he's turned into a terrible person? But you can't do both. You've got to pick one or the other. And generally the courts give a lot of leeway to the counsel who makes a tactical decision. But before he does that, the guidelines, and I'm not saying you can argue the guidelines don't control the courts. At least one justice has made that argument. But if the court were to follow the guidelines, and this is the first capital case I've seen that would be applying the 2003 guidelines, the kind of investigation that you would have to make in order to make that decision sounds to me like somewhat more extensive than this investigation. Your Honor, you could look at the allegation. Look, what you just described, his terrible upbringing, was known to counsel. Ms. Ockenfield's report is replete with evidence of all sorts of things going on. Discipline in school, mother not in attendance, grandfather distance, grandmother abusive. Was there any evidence that defense counsel discovered the allegations of child molestation by the grandfather or the possibility that the grandfather was actually his father during their penalty phase investigation? The record does not contain that information. I do not think it was brought up during the deposition. So that's now in the habeas record. Why doesn't that raise something for which an evidentiary hearing should have been held? Because if that was true and it was missed, that's a big chunk of evidence to miss. Your Honor, as the district court found on some of this, would it have changed what they decided to do? Look, all mitigation is a double-edged sword. You can sit here and counsel may come in and say, present the abused child. But there are cases on the record where they forewent the abused child because there were going to be other things that came out as a part of that. And this record has all sorts of minefields for defense counsel and they knew it. You put on the abusive family, who are you going to call for the abusive family? Are you going to put the mother on? Okay, but my question is slightly different because I'm looking at the evidentiary hearing standard. And it says, unless the motion, the files and records of the case conclusively show that the prisoner is entitled to no relief. And I guess I'm wondering if Judge McGeeh properly applied that standard in declining the evidentiary hearing when there's this new evidence and somehow it needs to be weighed. I mean, I think it's somewhat important to know whether it's true and what effect it might have had. I mean, I don't know. When it says shall grant a prompt hearing and determine the issues and make findings of fact, it seems to me that's an evidentiary hearing. That's not a hearing where you just have arguments. It's not just requiring an evidentiary hearing where you make findings of fact. And that troubles me somewhat that that was not done here with this new evidence. Your Honor, my answer to that is that this was not just done on argument. We deposed all three attorneys. The government deposed and habeas counsel deposed. Those matters were not addressed during the deposition. But you're a prosecutor. You've done lots of trials. You know that a witness's credibility and demeanor make a lot of difference when you're making factual findings. And I also am aware that all three counsel appeared before the district court judge for a very long period of time in this case. There were evidentiary motions. There was this jury selection, the trial. It's not like the judge had no concept of who this person was and, you know, can I trust their judgment. She had the opportunity to observe them over the course of about a year and a half in preparation for the trial. So she had enough of a record to know. So I think the question for the court is whether you know everything there is to know, would that molestation, if proven true, have changed anything? Which molestation are we talking about? I've lost track of this. There's no evidence. Is there that George molested Lesmond? My recollection of the record is that there is none, that this is more a. . . George allegedly molested some other kids. It's sort of a 404 being that he molested kids before. And possibly his daughter. Pardon? And possibly his daughter. Yes. Okay, but not, I just want to make sure I'm clear, but not the defendant. There was nothing in anybody's discussion prior to the trial. . . Is there anything that alleges that George ever molested Mitchell? That's correct. Okay. What do you make of Ms. Kim's suggestion that there is a factual dispute about what counsel's strategy was? One thought it was going to be A, another thought it was going to be B, and the left-hand didn't know what the right-hand was doing? Your Honor, I think what it is, is that the strategy in the depositions to counsel, the strategy came out essentially the way they wanted it to do. They wanted the Aberrant Act, the life worth preserving, the Navajo Nation letter. There's no discussion here of what went wrong. There's no allegation that, well, this clearly went way off the track as to what way we're going to present. It all fit in. It led to a cohesive closing argument by counsel seeking any number of reasons for a juror, whether it be mercy. And let's remember, the trial jury, the sentencing jury, found three mitigating factors by unanimity, including the fact that someone else similarly situated was not facing the death penalty. And yet the jury found that this course of conduct, and it's a course of conduct. It's not just somebody lost control and somebody's dead. There was a plan. The plan was carried out. Two people died. They come back the next day. They behead them, strip them of clothing, and leave them. And two days later, take the blood-soaked truck and commit an armed robbery at gunpoint. There's no dispute this was a horrific crime. And so the question is to how does an abusive, and the court knows you have seen very abusive upbringings. He had some abuse, there's no question. But this pales in comparison to an awful lot of the stuff that has been presented on behalf of defendants in capital cases. I think that he was beaten by his mother until he was in sixth grade. Not a great thing, but no allegations of beatings after sixth grade. So the question is, again, who do you call to prove all this stuff, and what happens when you go to the experts? Under Rule 12.2, if they're going to go diminished capacity, the government has an opportunity to have the defendant examined. If the expert's going to testify, his reports have to be disclosed. So the government's going to find out things that the defense in this case did not want, because every one of the experts had very bad things that the defense counsel did not want the jurors to hear. They already heard enough. There was no need to pile on. And so the strategic decision was tried to focus away and say, he is not an irreparable monster. He has some capacity to do some kind of good for the rest of his life in prison. The other evidence, substance abuse. Lifestyle choice. Is that going to cause a jury to say, I think that's an excuse here, because you chose to do meth and ecstasy? I think you're making a good argument for not choosing the strategy that was chosen. That kind of a horrific crime. What strategy do I choose? Well, you've got to choose a strategy of trying to show that he's what he is, because of his horrific upbringing, and that he shouldn't be blamed for what he is entirely. It's not a guaranteed winner. It's not a guaranteed winner. No, so, I mean, you have to kind of make a judgment call. What do you think will work with a given jury in a given case? Your Honor, if I might, point you back to what Counsel Sears said, that he had noticed in his trials after 9-11 that jurors were less sympathetic to excuses, if you would, for committing horrific crimes. And, yes, Judge, we could sit here until the end of the day and discuss the very benefits of, he was molested, will that excuse what he did? That's why you need a total investigation. And that's one of the questions. I mean, was it the kind of investigation that complied with the rules? And when did they decide not to make that total investigation, if they did? You know, what you look for before a trial is a different result. You're trying to get him acquitted. When he's convicted and you look for something, you're looking for something different. You're trying to prove how bad he is. That's not a trial strategy. That's a sentencing strategy. And that's why I think you have to keep the two things somewhat separate. And that's why the timing of what you're looking for is significant. And it's different. You're looking for something different at sentencing than you're looking for at trial. Your Honor, I would submit that, and I think Mr. Williams in his deposition made it very clear, they really didn't have much to work with for trial. What they did was all directed towards sentencing. And as I can only point out to the Court, Ms. Ockenfield interviewed an awful lot of people. Counsel interviewed people. The people who would have at that point had knowledge of what may have happened to Mr. George in the past weren't forthcoming. There was no red flag. There was no allegation from the family or from anybody else that they could talk to that said, you need to go check out George Mitchell. Most people said George Mitchell was a great cultural individual for the Navajo Nation. Now, the investigation suggests that there were some blemishes on that record as well. But all I can offer to the Court is that, as Judge Silverman says, none of these were sure-fire winners. What would have been the downside of doing? He was a good student. He was an athlete. He was the valedictorian. He was all these other things. And he had a horrible upbringing. I think what counsel was concerned about is, again, who's going to bring in the disrupted Native? They brought in Bobbie Mitchell, and you heard her basically apparently talk all about herself for 29 minutes of a 30-minute tape. I saw that videotape, and I don't see how it was helpful at all. But they made, I mean, to Judge Wordlaw's point, didn't they then argue, look at who his grandmother was? That was the point of that. She's a piece, I think they said she's a piece of crap, if I'm not mistaken. I think it helped. It certainly helped with their argument that he had not the worst or not the best upbringing. In terms of reservation cases. So what you said just there harkens back to one of the perplexing things that I found about the closing argument was that they were arguing, they were, they were arguing about, I think they were trying to throw in both things, but they didn't throw in the negative to the extent they could have to make it more persuasive or maybe generate more sympathy. And it was that because they didn't thoroughly investigate it, or was that for a strategic reason? Your Honor, if you look at the witness testimony, it touched on the cold childhood and some of the things that went on. But they were trying to just give a sample to the jury. They didn't want to dwell on any one thing because none of that was going to win. It basically was, here is the whole picture. He had somewhat of a deprived childhood, but he turned out to be a good student. He turned out to be a good athlete and a leader. And he got hooked up with this crazy Johnny Orsinger who had killed before and probably killed on this occasion. And it's not fair that he, of all of these carjackers, because they brought in the evidence of the other carjackings and what happened in that, the burned bodies and the shots to the head, that it was not fair that Lesmond Mitchell was facing death penalty when Gregory Nakai was not. Nor was Johnny Orsinger. Now, Johnny's was by function of his age, but Gregory Nakai's was by a decision of the Attorney General. Do you think that it's fair? I mean, as a prosecutor. We don't do fair or just. I'm just curious because we know that the prosecutor, which I assume you were part of this decision, did not recommend the death penalty. Your Honor, that is really not in the record. That, I believe, it's in your record. In terms of the actual record, I believe that came from some notoriety when a U.S. attorney at that time was fired and there were hearings in Washington and some of that evidence came out. But that's not in the trial record. But is it true? Because the only decision, well, Your Honor. I'm afraid it's another word you're not supposed to use, right? You feel constrained by the record, I presume. Because I understand the rules generally, you know, the protocols established by the Attorney General are not discoverable and it's not that I'm trying to. I understand what you're saying, but was there testimony to that effect before Congress, I guess, that Charlton so testified? I can't tell you if it was in front of Congress or the newspapers, but there was a lot of notoriety after the firings of I think it was eight U.S. attorneys. And your question to me is do I think it was fair that Mr. Mitchell faced while, yes. Well, possibly someone who was more culpable didn't. You know, I'm not sure that's a fair question to ask, counsel, to be honest with you. I mean, you're not supposed to argue your personal belief in the case or anything. Let me just say. I think I just, I'm asking him because of the possibility of, you know, I'm wondering whether as you go ahead and whether. I think one reason Judge Wardlaw might be inquiring into that is there is a possibility after the argument and after we confer about it as that we might refer the case to our mediation unit, which has surprisingly settled a capital punishment case among our record of very successful settlement discussions. I think Judge Wardlaw was trying to explore whether the government ultimately, and I don't think she expects you to provide an answer today, but whether the government would willingly participate in those discussions. If we were to refer it after we hear the argument and after we discuss it, we wouldn't want you to be surprised if that's one of the options open to us. And I think one of the considerations Judge Wardlaw might have in mind is whether, how the government might feel about the checkered history the case had, and the record which one of us discovered of the government's history in capital cases since 19-whatever it was-60, which was I think the last execution prior to the renewal starting with Timothy McVeigh and two others, that it might be that the government would be willing to at least discuss with the mediator whether there was any possibility, for instance, of referring this to the Attorney General for his view or whatever. We don't like to spring a mediation order on anyone. And so I think she wanted to inquire into whether- Since we had talked about it before the hearing and Judge Reinhart was the one who was supposed to bring it up, I didn't want to bring that particular thing up, so I was asking the question in my own way, Judge Silverman. Do you see any downside to this mediation? Let me cut to the chase. Your Honor, can I duck that question by saying that comes from above my pay grade? Can you check with the people above you? Well, if you get an order, I assume you will. I mean, if we issue a mediation order. That's why I didn't ask you. I was going to ask at the end of the arguments about this, but I wouldn't have asked you what your reaction would be to that. I assume just what you said, you'd say would be above your pay grade. So I wasn't going to inquire as to how you felt, but I was going to say that when you get an order, that you, I assume, would just check with your superiors, who would either say yes, we'll come, or no, we won't, and I would be surprised if they said no, we won't. Well, Judge, I will certainly pass on any communications. All I will simply say is that I think this case really rises and falls in large part on what Counsel Sears said. It was a matter of who was killed and how they were killed. And if there are no further questions, thank you very much. Thank you. To refer to the point about investigation of Mr. Mitchell's childhood, the ABA guidelines, but also pre-existing case law, make clear that even if certain sources are not forthcoming, and perhaps George Mitchell was not, and perhaps Bobby Mitchell would not have been forthcoming about information that her husband was implicated in child molestation, that counsel should seek alternative sources of information regarding the key players in a capital defendant's life. And here habeas counsel found, by looking at the people around those key players, that information regarding child molestation, multiple instances. The best evidence you have on George, tell me if I've got this right or wrong, the worst thing you can say about George is that he molested the, was it the sister? The half-sister. And a cousin? And a neighbor child, there was an allegation. Nothing regarding Mr. Mitchell? There's nothing regarding Mr. Mitchell, but even apart from any direct impact on Mr. Mitchell, it goes to the larger picture of his childhood. We have, counsel had in the social history report that there were conflicts between the mother and grandmother. I agree, that's not a feather in George's cap that he's molesting other children, but in terms of how it affects this case, just so we all know what the facts are, and I want to make sure I especially understand, you don't have any evidence, you didn't present any evidence that he molested Lesmond Mitchell? No, Your Honor, there's no direct evidence of that. Well, okay. Or circumstantial evidence of it? You're not saying he did. But what you're talking about, I assume, is that they're supposed to investigate the family history of not only abuse of the individual, but the circumstances in which he lived, such as family instability, even neighborhood environment, other traumatic exposure to criminal conduct. Those are all different factors from being a victim of molestation. And you're, I assume, referring to the question of exploring those other issues, not exploring any molestation of the defendant. Yes, Your Honor. For instance, in the Hamilton case, there was evidence of incest in the household, not directly relating to the defendant in that case, but to present a picture of the family. Let me make clear that we're not talking about the molestation of the defendant. Well, what I'm trying to also do is figure out what a hearing would accomplish. It came to Judge Merguia's attention that George had molested, had the people's names, Mary, was it Mary Reed and Marvina, how do you say it, Drozd? Well, you know, whoever they were. That came to Judge Merguia's attention. That fact is already in front of her before, was before her, and she concluded basically that that wouldn't have made any difference, I gather. Is that right? Because Mitchell himself wasn't the victim. She didn't rule on prejudice grounds, but since those two inquiries are related, she found that counsel was not ineffective. Because why? She felt that the social history that they had done was sufficient. Okay. So at least. It was reasonable not to go further. So at least as to this point, there's no reason for a hearing because we've established, we've taken as a given that George molested these two people as to this point. Yes, Your Honor. If you take all of that as true, if the government is not contesting that information. The judge took it as basically true and said, well, they did other things. She, but again, this was based on the presupposition that they had conducted a reasonable investigation up to that point. As the Supreme Court said in Sears v. Upton, you know, a tactical decision is a precursor to any reasonable strategy. So to say that it was reasonable not to pursue that further. Okay, that's a different question. See, that's a legal conclusion. But the fact that these two girls were molested by George has already been established. You don't have to prove it again. If this court will take that as true and the government would concede that, then. Well, the judge said it wouldn't make any difference. I know about it and it wouldn't make any difference. Now, she may be wrong about that, but, I mean, you don't need to go back and tell her again. I mean, there are instances, perhaps in that instance, a hearing would not be required on that sole single point. However. That's why I've been trying to pin you down on exactly what we'd need a hearing on. I think I've got you down as saying the lawyers were at sixes and sevens and we want to ask them that kind of thing. Beyond that, I'm not getting a clear picture of what would need to be established at a hearing. I mean, that's at the root. That question is at the root. What they decided and, again, when they made these decisions because everything flows from that initial investigation. And where they decided to curtail that investigation and the reasons for doing so. That's the problem I've been trying to ask about, too. It may well be in the record, but I wanted to know, did they curtail the investigation? When did they decide to curtail the investigation? How much investigation had been done at the time they decided to go for one option rather than the other, if they made that decision? I'm not clear so far. And it may be clear, as I say. It may be sufficiently clear already. But as Judge Silverman has accurately described your position, that's what it seems to me it comes down to at a hearing unless this has been explored sufficiently. Can we pin this down to whether they elected one option or the other? Or if they didn't elect it, did it affect the scope of the investigation into the bad guy rather than good guy option? Did that affect the investigation? Where did it cut it off? Did they treat the second option fully and conduct a full investigation of the second option? And if not, when was that decision made? Is that something you intend to present at a further hearing? Or has that been sufficiently explored to make a decision on those questions? Your Honor, based on something Judge Werdahl said earlier, they did try to bring up this terrible childhood social history, elements of the bad guy, bad stuff, how he became a bad guy at the penalty phase. So until then, there was no reason for them to have curtailed that investigation up until that point. So to the extent that they said that, yes, we did abandon that earlier, there is a sufficient conflict with the record, the cold record, that that requires a hearing to explore. Okay, thank you. And to respond to Your Honor's point about mediation, Mr. Mitchell would welcome and participate in such mediation. So am I correct that he, so he's sentenced to capital punishment on the carjacking count? Yes. Only? Yes. Okay, and then aside from that, it's two life sentences plus? 384 months, yes. Okay. The carjacking count is the capital count in this case because the Navajo Nation has not opted into the death penalty. Thank you, counsel. Thank you. Judge Reynard, I wonder if you would mind if I could just ask one other thing of Mr. Kirby. I just want to make sure, I don't see any reason not to ask you to ask your higher-ups about mediation. Do you see any reason why we shouldn't ask you to do that? I don't know of any reason why anyone asks a question. No harm in asking. Okay. All right, but just to sort of prepare you in advance since that's one of the options, so you don't just receive something in the mail and say, what happened here? I'm certainly prepared now as to whether my upper management is, we'll work on it. Okay, thank you. Thank you. Ms. Kim, thank you. The case just argued will be submitted. Thank you both for your arguments.
judges: Reinhardt, Silverman, Wardlaw